COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Chief Judge Decker, Judges Huff and Callins
Argued at Richmond, Virginia


JOHN D. CUMBERLAND
                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 0769-22-2                       JUDGE GLEN A. HUFF
                                                     SEPTEMBER 19, 2023
BOARD OF SUPERVISORS
  OF MIDDLESEX COUNTY, ET AL.


                 FROM THE CIRCUIT COURT OF MIDDLESEX COUNTY
                              Jeffrey W. Shaw, Judge

            David A. Bury (Andrew G. Bury, Jr.; Bury & Co. - Attorneys at
            Law, on briefs), for appellant.

            Heather W. Lewis (Middlesex County Attorney, on brief), for
            appellee Middlesex County Board of Supervisors.

            E. Stanley Murphy (Murphy Law Offices, PLC, on brief), for
            appellees Tony Lauro, III and Julie C. Lauro.


        John Cumberland ("appellant") filed a petition for a writ of certiorari in the Middlesex

County Circuit Court (the "circuit court"), pursuant to Code § 15.2-2314, seeking review of a

land use decision by the Middlesex County Board of Zoning Appeals (the "BZA").[1]  The circuit

court ultimately dismissed the petition on the ground that appellant lacked standing under Code

§ 15.2-2314.  On appeal, appellant assigns error to the circuit court's finding that he failed to

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] In accordance with statutory requirements, the writ was titled "In Re: June 21, 2021
Decision of the Board of Zoning Appeals of Middlesex County."  Appellees—Tony Lauro, III,
Julie C. Lauro, and the Middlesex County Board of Supervisors—were included in the action as
necessary parties.  *See* Code § 15.2-2314.  One of the Lauros' other neighbors, Kemper Walke,
III, joined appellant as a petitioner on the writ.  Mr. Walke is not a party, however, to appellant's
appeal of the circuit court's judgment, nor has he filed his own separate appeal.

plead sufficient facts establishing a particularized harm resulting from the BZA's decision. For the following reasons, this Court affirms the circuit court's judgment dismissing the case for lack of standing.

BACKGROUND

Introduction

A basic tenet of property law is that landowners are generally entitled to freely exercise the bundle of rights associated with ownership of their property.[2] This includes using or developing the land and any structures thereon to the extent permitted by law.[3] Local zoning ordinances are one way by which a landowner's property rights may be curtailed based on the governing authority's deference to public and state interests. As relevant here, the Chesapeake Bay Preservation Act (the "CBPA") and corresponding zoning ordinance in Middlesex County seek to protect the natural integrity and quality of the Chesapeake Bay by restricting landowners' rights to use and develop any parts of their property designated as protected zones under the purview of the CBPA.

Nevertheless, landowners seeking to utilize the land within those protected areas for a prohibited purpose may apply to their local Board of Zoning Appeals for a specific exception to

---

[2] *See, e.g.*, *Lovelace v. Orange Cnty. Bd. of Zoning Appeals*, 276 Va. 155, 159 (2008) ("Restrictions on 'the free use of land, although widely used, are not favored and must be strictly construed and the burden is on the party seeking to enforce them to demonstrate that they are applicable to the acts of which he complains.'" (quoting *Waynesboro Vill., L.L.C. v. BMC Props.*, 225 Va. 75, 80 (1998))).

[3] *See, e.g.*, *Commonwealth Marine Res. Comm'n v. Forbes*, 214 Va. 109, 113 (1973) ("As a legal concept, 'property' is a body of rights, including a right to use."); *D.R. Horton, Inc. v. Bd. of Supervisors*, 285 Va. 467, 473 (2013) ("'[D]evelopment rights are property rights' protected under Virginia law." (quoting *Bentley Funding Grp., L.L.C. v. SK & R Grp., L.L.C.*, 269 Va. 315, 331 (2005))); *United States v. Craft*, 535 U.S. 274, 278 (2002) ("A common idiom described property as a 'bundle of sticks'—a collection of individual rights which, in certain circumstances, constitute property. State law determines only which sticks are in a person's bundle." (citations omitted)).

the restriction. The BZA's primary concern when evaluating such applications is whether approval of the proposed land use will violate the mandates of the CBPA and local zoning ordinance. If the BZA is satisfied that the proposal—including an adequate plan to mitigate the environmental impact of the expected development—will not cause a degradation of the water quality in the protected areas, it may grant the exception request authorizing the landowner to undertake the previously prohibited activity.

In the case at bar, the Middlesex County BZA approved two such applications and granted the landowners exceptions to expand and improve their current residence within a portion of the CBPA-protected zone on their property. Appellant, a neighboring landowner, challenges that decision on the ground that one of the mitigation measures—planting new trees—will infringe his own property rights through vegetative encroachment onto his land.

The CBPA and Middlesex County's Zoning Ordinance

Although the restrictions on developing one's own property, as mentioned above, are created by local governing bodies and enforced by the BZA, they are the direct progeny of the CBPA and exist solely to carry out the goals of the Act throughout the state.

The General Assembly enacted the CBPA, codified at Title 62.1, Article 2.5 of the Code, in 1988 with the express purpose of protecting "the public interest in the Chesapeake Bay, its tributaries, and other state waters." Code § 62.1-44.15:67(A).[4] To effectuate that goal, the Act instructed the counties, cities, and towns of "Tidewater Virginia" to "define and protect certain lands, . . . which if improperly developed may result in substantial damage to the water quality of the Chesapeake Bay and its tributaries." *Id*. After determining the extent of protected land

---

[4] The legislature also acknowledged that the CBPA would promote "the general welfare of the people of the Commonwealth" because "[h]ealthy state and local economies and a healthy Chesapeake Bay are integrally related; balanced economic development and water quality protection are not mutually exclusive." Code § 62.1-44.15:67(A).

within their jurisdictions, those localities were tasked with incorporating into their zoning ordinances "measures to protect the quality of state waters" within the designated preservation areas. Code § 62.1-44.15:74(A), (C).[5]

Being a Tidewater locality subject to those mandates of the CBPA, Middlesex County adopted a zoning ordinance—hereinafter referred to as the "Bay Ordinance"—designed to "support the goals and objectives of the [CBPA]" "by minimizing the potential adverse effects of human activity upon" the "the Chesapeake Bay, its tributaries, buffer areas and other sensitive environmental lands." Middlesex Cnty., Va., Ordinance 71, art. 4A, § 4A-1 (2022).[6] As relevant to this case, the Bay Ordinance designates certain parts of these protected areas, subject to land use restrictions, as Resource Protection Areas ("RPAs"). *Id.*; *see also* Zoning Ordinance 71 at § 4A-4.[7]

---

[5] "Each local government in Tidewater Virginia shall publish on its website the elements and criteria adopted to implement its local plan as required by this article." Code § 62.1-44.15:67(C).

[6] Article 4A—"Chesapeake Bay Preservation (CBP) District"—of Middlesex County's Zoning Ordinances, hereinafter cited as "Zoning Ordinance 71," can be found online by visiting https://www.co.middlesex.va.us/254/Ordinances.

[7] Some RPAs include land next to bodies of flowing water that provide natural protection against nutrients and other harmful substances in surface runoff. *See* 9 Va. Admin. Code § 25-830-80(A)-(B). RPAs also include the following:

> a. Tidal wetlands;
> b. Non-tidal wetlands connected by surface flow and contiguous to tidal wetlands or water bodies with perennial flow;
> c. Tidal shores; and
> d. A vegetated buffer area not less than 100 feet in width located adjacent to and landward of the components listed in subsections a. through c. above, and along both sides of any water body with perennial flow.

Zoning Ordinance 71 at § 4A-2; *see also* 9 Va. Admin. Code § 25-830-80(B).

An important aspect of the protection plan for RPAs is the existence of "setbacks," which carry their own set of regulations restricting interference by landowners. Zoning Ordinance 71 at § 4A-8-9. Setbacks "adjacent to and landward of" RPAs consist of "a 100-foot[-]wide buffer area of vegetation that is effective in retarding runoff [and] preventing erosion." *Id.* at § 4A-7(A).[8] Unless the BZA grants an exception, the Bay Ordinance prohibits land development and encroachment within RPA setbacks so as "[t]o minimize the adverse effects of human activities" on RPAs, "state waters, and aquatic life." *Id.* Any landowner seeking an exception must comply with the procedures outlined in Section 15 of the Bay Ordinance, which include "identify[ing] the impacts of the proposed exception on water quality and on lands within the [RPA] through the performance of a water quality impact assessment." *Id.* at § 4A-15(A).

After reviewing a properly submitted request, the BZA "may grant the exception" if it finds that such request satisfies all five criteria listed in Section 15(C).[9] *Id.* at § 4A-15(C). Of particular relevance here is the requirement that "[r]easonable and appropriate conditions are

---

[8] Setbacks of fifty feet exist on the seaward side of RPAs. Zoning Ordinance 71 at § 4A-9.

[9] The five requirements, in their entirety, are as follows:

> (1) Granting the exception will not confer upon the applicant any special privileges denied by this Article to other property owners in the Overlay District; (2) The exception request is not based on conditions or circumstances that are self-created or self-imposed, nor does the request arise from conditions or circumstances either permitted or non-conforming that are related to adjacent parcels; (3) The exception request is the minimum necessary to afford relief; (4) The exception request will be in harmony with the purpose and intent of the Overlay District, not injurious to the neighborhood or otherwise detrimental to the public welfare, and is not of substantial detriment to water quality; and (5) Reasonable and appropriate conditions are imposed which will prevent the exception request from causing a degradation of water quality.

Zoning Ordinance 71 at § 4A-15(C).

imposed which will prevent the exception request from causing a degradation of water quality."
*Id.* at § 4A-15(C)(5). In essence, the BZA must determine whether the negative impact of the proposed developments within the setback is adequately offset by the landowner's proposed mitigation measures such that granting the exception request will not undermine the purpose of the CBPA and Bay Ordinance.

<u>BZA Decision Contested by Appellant</u>

Tony Lauro, III and Julie C. Lauro (the "Lauros") own waterfront property along the Chesapeake Bay in Middlesex County that includes setbacks for a designated RPA. Appellant owns property adjacent to the Lauros. The Lauros submitted two applications with supporting documents to the BZA seeking exceptions for proposed developments on their property that would encroach upon the 50-foot RPA setback.[10] Both applications included the same mitigation measures to reduce runoff and protect the water quality of the RPA in accordance with the Bay Ordinance and CBPA.

Specifically, the Lauros provided diagrams showing their proposed placement of a new rain garden, drain field, and vegetative cover, the latter consisting of "13 canopy trees, 26 understory trees, and 39 shrubs" along the Lauros' side of the boundary line dividing their property from appellant's property. According to the Lauros' architect, those proposed mitigation measures would reduce surface runoff into the RPA by absorbing the majority of all rainwater and only discharging any excess after it passed through the new filtration system. That

---

[10] BZA Applications CBPA#2021-11 and CBPA#2021-12. One of the Lauros' applications requested an exception to expand their house within the 50-foot RPA setback. The original house already encroached upon the 100-foot RPA setback, which constitutes a significant portion of the Lauros' property. The footprint of the expanded house would total 1,350 square feet and have two stories. The other application requested an exception to build a pool and a terrace within the 50-foot RPA setback. Both applications included documents, diagrams, and other information required by Article 4A, Section 11 of the Bay Ordinance: "Plan of Development Process."

plan also served to replace the "impervious cover" within the RPA that would be removed during the Lauros' developments to their residence.

The BZA held a public hearing on the Lauros' applications on June 21, 2021, where appellant objected to the requested exceptions. Appellant complained that the vegetative components of the Lauros' mitigation plan, as indicated in the site drawings submitted with their applications, would result in future tree limbs encroaching on his property, thus obstructing his view of the water and diminishing the value of his property.[11] Despite appellant's protests, the BZA approved the Lauros' applications, including their proposed mitigation measures, and granted their exception request to encroach into the 50-foot setback on their property.[12]

In doing so, the BZA acknowledged that the Lauros had properly "submitted their plan," "developed mitigation measures," and addressed "how much permeable land there is, how much they're taking away, [and] what they're going to do about it." It found that the Lauros had "met [its] established [CBPA] exception history" and provided "everything that [the BZA] ha[s] looked at in the past" when granting such exceptions. The BZA further noted that its "concern is not the view, but the footprint of the impermeable area that is being installed" and whether "the mitigation proposed is adequate for the impact."[13]

_____

[11] Appellant admitted that his property has a direct waterfront view in addition to the side view through the Lauros' property.

[12] The BZA approved the exception for application #2021-11 without any conditions or amendments. With regard to application #2021-12, however, the BZA approved the Lauros' request for an exception to build a pool and terrace within the RPA setbacks, but "with the amendment that the pool and deck (terrace) will not be east of the 50-foot with the exception of the small southeast corner of the proposed house." Pursuant to this amendment, the Lauros' were required to submit revised drawings to the Building and Zoning Department in order to receive final approval of development of the pool "completely behind the 50-foot RPA" setback and the terrace "only slightly" imposing into the 50-foot RPA setback.

[13] In addressing appellant's arguments regarding his view of the water through the Lauros' property, the BZA commented that "no one has a legal right to a view" and "view is a lawsuit issue, that's not our issue."

On July 16, 2021, appellant petitioned the circuit court to review the BZA decision pursuant to Code § 15.2-2314, which requires the petitioning party be "aggrieved" by the decision. Appellant alleged himself to be "aggrieved" by the decision because it "authorized an encroachment of tree limbs" over his property, thereby obstructing his view of the waterfront and diminishing the value of his own land. The Middlesex County Board of Supervisors (the "Board"), joined by the Lauros, filed a motion to dismiss appellant's petition for lack of standing.

In relevant part, the Board asserted that "the alleged harm of the proposed trees and shrubs planted on the site plan as presented to the BZA . . . is too speculative to confer standing and does not implicate a personal or property right sufficient to render [appellant] 'aggrieved'" under Code § 15.2-2314. It further noted that appellant "has available to him a remedy pursuant to nuisance or trespass law, should he believe he is harmed by the alleged encroachment of trees on his property in the future."

The circuit court held a hearing on the motion to dismiss on March 11, 2022, at which appellant abandoned his claims that the Lauros' developments would obstruct his view and decrease his property value—acknowledging that such harms were not particular to him but rather would affect the "general public." Instead, appellant argued only that "the land use decision approving the placement of these trees" threatened his "unique property right" against trespass or nuisance because the tree limbs and roots would inevitably encroach onto his property

After reviewing the record and considering each party's arguments, the circuit court granted the Board's motion and dismissed appellant's petition for lack of standing.[14] In doing

---

[14] The final order dismissing appellant's petition for lack of standing was entered on April 20, 2022.

so, it held that appellant was not "aggrieved," as required by Code § 15.2-2314, because his alleged harm was too speculative and did not "implicate a personal or property right" affected by the BZA decision. The circuit court specifically noted that it did not "believe the trees have to be in those specific locations. And even if they do, how they grow, where the roots go, where the canopies end up . . . is something that we wouldn't find out for another 20 or 30 years." The circuit court also reasoned that the Lauros could still plant the trees at issue on their property even if it reversed the BZA decision allowing the Lauros to expand their home into the RPA setbacks. And in either scenario, if the Lauros maintained the trees to prevent encroachment, appellant would never suffer any of his contemplated harms.

This appeal followed.

ANALYSIS

The sole question before this Court is whether appellant has standing to appeal the BZA's decision granting the Lauros a land use exception for the expansion of their house into RPA setbacks. The right to appeal a BZA decision, separate from a general attack on the constitutionality of the underlying zoning ordinance, arises exclusively from Code § 15.2-2314. Because "the provisions of Code § 15.2-2314 govern 'the proper institution of a proceeding thereunder'" and "interpretation of a statute presents a question of law," this Court reviews the circuit court's dismissal of appellant's petition de novo. *Frace v. Johnson*, 289 Va. 198, 199 (2015) (quoting *Bd. of Supervisors v. Bd. of Zoning Appeals*, 225 Va. 235, 238 (1983)); *see also Anders Larsen Tr. v. Bd. of Supervisors*, 301 Va. 116, 122 (2022) (holding that "the question of whether the appellants' factual allegations were sufficient to establish standing" is a question of law the Court reviews de novo on appeal (quoting *Platt v. Griffith*, 299 Va. 690, 692 (2021))).

Pursuant to Code § 15.2-2314, only a person "aggrieved" by the BZA decision has standing to challenge that decision. Appellant's claim on appeal that he is "aggrieved" hinges on

- 9 -

a single argument: that vegetative encroachment onto his property from his neighbors' future trees will harm his own unique property rights as an adjacent landowner. He asserts that recent decisions from the Virginia Supreme Court, issued after the circuit court's decision in this case, demonstrate that the nature of his alleged harm is sufficiently definite and traceable to the BZA decision to establish standing under Code § 15.2-2314. He therefore contends that the circuit court erred in dismissing his case without considering the merits of his petition to review and reverse the BZA decision. For the following reasons, this Court disagrees and affirms the circuit court's judgment dismissing the case for lack of standing.

Standing to Challenge BZA Decisions

Code § 15.2-2314 authorizes circuit courts to review BZA decisions pursuant to a properly filed writ of certiorari by a party with standing. To acquire standing under the statute, a petitioner must be "aggrieved" by the challenged BZA decision. Code § 15.2-2314; *see also Braddock, L.C. v. Bd. of Supervisors*, 268 Va. 420, 425 (2004) (holding that petitioner bears burden of "show[ing] that he has been aggrieved by the judgment or decree appealed from" to obtain standing).[15] In interpreting this statute, the Supreme Court has prescribed a two-prong test to determine whether a party is "aggrieved." *See Friends of the Rappahannock v. Caroline Cnty. Bd. of Supervisors*, 286 Va. 38, 48 (2013).

Under the first prong of that test, a petitioner must plead sufficient facts showing that he "own[s] or occup[ies] 'real property within or in close proximity'" to the property at issue. *Seymour v. Roanoke Cnty. Bd. of Supervisors*, 301 Va. 156, 165 (2022) (quoting *Va. Beach Beautification Comm'n v. Bd. of Zoning Appeals*, 231 Va. 415, 420 (1986)). A petitioner who fails to meet this "close proximity" threshold lacks standing because he does not have "a direct,

---

[15] The statute also states that the court "may permit intervention by any other person or persons jointly or severally aggrieved by any decision of the board of zoning appeals." Code § 15.2-2314.

- 10 -

immediate, pecuniary, and substantial interest in the [challenged] decision." *Id*. (quoting *Va. Beach Beautification Comm'n*, 231 Va. at 420). Here, no party disputes that appellant satisfies this "close proximity" prong where his property directly abuts the Lauros' property, resulting in a shared common boundary.

Turning to the second prong, a petitioner must "allege facts demonstrating a particularized harm to 'some personal or property right, legal or equitable, or imposition of a burden or obligation upon the petitioner different from that suffered by the public generally.'" *Friends*, 286 Va. at 48 (quoting *Va. Marine Res. Comm'n v. Clark*, 281 Va. 679, 687 (2011)). This requires the petitioner to "articulate legally enforceable rights" affected by the BZA's land use decision. *Id*. As the Court explained in *Braddock*, a non-owner seeking to challenge a land use decision must establish standing by "show[ing] that he has been aggrieved by the judgment or decree appealed from." 268 Va. at 425 (quoting *Harbor Cruises, Inc. v. State Corp. Comm'n*, 219 Va. 675, 676 (1979)). Such party "does not have standing to assert purely abstract questions" and may only "*seek the correction of errors injuriously affecting him*." *Id.* at 425-26 (quoting *Harbor Cruises*, 219 Va. at 676).[16] Appellant does not meet the requirements of this so-called "particularized harm" prong because his allegations of future harm are too speculative.[17]

---

[16] The dissent would find appellant has standing because the trees will inevitably encroach onto appellant's property, such encroachment "will impose a burden on Cumberland in a way that is 'different from that suffered by the public generally,'" and that burden will be a direct result of the BZA's decision. But that conclusion relies on multiple adopted assumptions. Whether the trees will encroach is a matter of speculation, as is any burden or obligation such encroachment would cause, and that possible outcome is not dependent upon nor a direct result of the BZA decision. To the contrary, the Lauros' future decisions when planting and maintaining the trees, the effects of which are currently unknown, would constitute the cause of appellant's claimed harm, irrespective of the BZA decision.

[17] The dissent repeatedly states that the factual allegations in appellant's petition are sufficient to establish standing because they demonstrate "a personal stake in the outcome of the controversy." Although the general jurisdictional concept of "personal stake" is encompassed by

At the outset, this Court recognizes that "[c]omplainants do not need to establish that the particularized harm has already occurred" before they can achieve standing under Code § 15.2-2314. *Friends*, 286 Va. at 49. To hold otherwise would strip complainants of the ability to challenge a BZA decision at a time when reversal of such decision could still affect a bar to the contemplated future harm. *See Anders*, 301 Va. at 121 ("The point of standing is to ensure that the person who asserts a position has a substantial legal right to do so and that his rights will be affected by the disposition of the case." (quoting *Cupp v. Bd. of Supervisors*, 227 Va. 580, 589 (1984))).[18]

Indeed, the rationale for permitting a court to essentially enjoin BZA-approved actions on a claim of prospective harm under Code § 15.2-2314 is similar in effect to allowing a declaratory judgment action challenging the broader constitutionality of a zoning ordinance.[19] The Supreme

_____

the Supreme Court's two-prong test, the dissent appears to treat it as a separate basis for appellant to establish standing by merely having an actual, personal interest in his neighbors' land use activities. That is not the legal standard for determining whether appellant has standing under Code § 15.2-2314 as a person "aggrieved" by the challenged BZA decision.

    As a separate issue, the dissent disagrees that the "controversy" in which a petitioner has a "personal stake" must be justiciable, such that the petitioner's "rights will be affected by the outcome of the case." *Charlottesville Area Fitness Club Operators Ass'n v. Albemarle Cnty. Bd. of Supervisors*, 285 Va. 87, 98 (2013) (quoting *W.S. Carnes, Inc. v. Bd. of Supervisors*, 252 Va. 377, 383 (1996)). The allegations of future harm offered here do not present a justiciable controversy under the parameters of Code § 15.2-2314 because the BZA's decision granting the Lauros an exception to the Bay Ordinance and CBPA does not affect appellant's claimed rights, nor will he lose the ability to assert any of his property rights in the future should the threat of vegetative encroachment become "certainly impending" or substantially likely. *See Morgan v. Bd. of Supervisors*, ___ Va. ___, ___ (Feb. 2, 2023).

    [18] A substantial consideration when evaluating a party's standing in such situations is whether the petitioner's alleged harm, and resulting loss of rights, can be prevented by proactive adjudication. Consequently, a petitioner lacks standing to challenge the BZA decision if the court's determination on the merits, irrespective of the outcome itself, would have no impact on the status of petitioner's rights nor serve to prevent the contemplated harm.

    [19] *See Charlottesville Area Fitness*, 285 Va. at 98 ("The General Assembly created the power to issue declaratory judgments to resolve disputes 'before the right is violated.'" (quoting *Patterson v. Patterson*, 114 Va. 113, 120 (1926))); *Morgan*, ___ Va. at ___ ("A declaratory-judgment action, after all, was meant to authorize the assertion of cognizable claims before they

Court has even held that the "aggrieved person" standard used for determining standing under Code § 15.2-2314 is equally applicable in declaratory judgment actions against zoning ordinances. *See Friends*, 286 Va. at 47 ("[I]t would be inconsistent to interpret the statutory section governing appeals from boards of supervisors [under the Declaratory Judgment Act] differently from the statutory section governing appeals from boards of zoning appeals [under Code § 15.2-2314].").

That being said, not every allegation of future harm is sufficient to confer standing under Code § 15.2-2314. *See Berry v. Bd. of Supervisors*, ___ Va. ___, ___ (Mar. 23, 2023) ("In doing away with the requirement that a litigant suffer actual damage before filing suit, the [Declaratory Judgment] Act does not permit a litigant to bring an action that is moot or in which the claims are so speculative that the action is not ripe for adjudication." (citing *City of Fairfax v. Shanklin*, 205 Va. 227, 229-30 (1964))). Since its decision in *Friends*, the Supreme Court has consistently recognized that a complaining party may seek prospective relief from a harmful land use decision only if the contemplated harm would arise from the land use authorized by the BZA and is not overly speculative. Thus, although all claims of future harm are inherently speculative to some degree, Supreme Court precedent "necessarily requires an exercise in judicial line-drawing" when determining whether a claim of future harm is too speculative and attenuated from the challenged BZA decision to warrant standing. *Morgan*, ___ Va. at ___.

Accordingly, the crucial components this Court must consider in analyzing appellant's claim of standing are the likelihood and immediacy of the alleged harm, as well as the causal

---

'fully matured' and before the 'alleged wrongs have . . . been suffered.'" (alteration in original) (quoting *Pure Presbyterian Church of Wash. v. Grace of God Presbyterian Church*, 296 Va. 42, 55 (2018))). *Contra Bd. of Supervisors v. Hylton Enters., Inc.*, 216 Va. 582, 585 (1976) ("[W]here claims and rights asserted have fully matured, and the alleged wrongs have already been suffered, a declaratory judgment proceeding, which is intended to permit the declaration of rights before they mature, is not an available remedy.").

element between the BZA decision and the future harm. In an opinion issued after the parties here filed their briefs, the Supreme Court expressly held that, for standing purposes under Code § 15.2-2314, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" *Morgan*, ___ Va. at ___ (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Appellant's factual pleadings are insufficient to show that his alleged future harm falls into either of those two categories.

The first category is easily discarded as a possible basis for standing here because the Lauros have not yet planted any of the objectionable trees on their property. Neither party argues to the contrary, having acknowledged that nonexistent trees cannot pose any immediate threat of encroachment. As to the second category, appellant's allegations are ultimately too speculative under the circumstances here to demonstrate with "sufficient definiteness" that harmful vegetative encroachment is substantially likely to occur. *See id.* at ___ (quoting *Squire v. Va. Hous. Dev. Auth.*, 287 Va. 507, 514 (2014)).[20]

Moreover, the second component of the standing analysis identified in *Morgan* requires such future harm "be fairly traceable" to the challenged BZA decision. *Id.* at ___ (quoting *Mattaponi Indian Tribe v. Va. Dep't of Env't Quality ex rel. State Water Control Bd.*, 261 Va. 366, 376 (2001)). The speculative nature of appellant's alleged harm precludes him from

---

[20] The dissent accepts as true appellant's "allegation that the BZA approved a future, inevitable, encroachment onto his property," because "it is a court's role to accept the sufficiently definite factual allegations in the complaint, as well as all reasonable inferences flowing from them." However, as stated in *Morgan*, only "factual allegations made with 'sufficient definiteness' are presumptively true." ___ Va. at ___ (quoting *Squire*, 287 Va. at 514). This Court finds that appellant's factual allegations lack "sufficient definiteness" and are therefore not "presumptively true." Additionally, the inferences appellant suggests are not reasonable based on *Morgan*'s requirements—that the alleged future harm be "certainly impending" or substantially likely, as well as "fairly traceable" to the BZA decision—and appellant's reliance on speculation renders those inferences "strained, forced, [and] contrary to reason." *Id.* (quoting *Doe ex rel. Doe v. Baker*, 299 Va. 628, 641 (2021)).

crossing this causal bridge. These dual shortcomings in appellant's arguments are fatal to his claim of standing and set his case apart from *Morgan*, as well as *Anders* and *Seymour*. The impending harms described by the petitioners in those cases are distinguishable in both nature and causation from the hypothetical harms of future encroachment appellant offers here.

For instance, the petitioners in *Anders* argued that the operation of a new, BZA-approved "treatment center in an otherwise entirely residential neighborhood" would cause "increased traffic" and thus result in the "diminished value of the immediate neighbors' properties." 301 Va. at 122-23. In support of that claim, they presented photographs showing "12 cars parked in the newly expanded Newport Academy parking lot as well as a picture of the Newport Academy transport van stuck in a ditch in front of a neighboring house." *Id.* at 120. The Supreme Court determined that the homeowners' claim was "entirely plausible" and held that the allegation of potential diminished property value was a "distinctive and non-trivial" pecuniary harm "sufficient to establish standing." *Id.* at 122.

The Court similarly found in *Seymour* that the petitioners had standing as "aggrieved" parties under Code § 15.2-2314 to challenge the BZA's grant of a special use permit because the petitioners "have incurred, and will continue to incur, several forms of particularized harm arising from the" BZA decision. 301 Va. at 165. There, the petitioners successfully demonstrated that the special use permit, which approved expansions to a nearby wildlife center accessible only by shared private easement, "would reasonably lead to more traffic on the easement" and thus cause "increased traffic congestion, noise, dust, and light pollution" on the petitioners' property. *Id.* at 162.[21]

---

[21] The petitioners lived in the "last house on the state-maintained road" leading to the easement through which the public could access the Southwest Virginia Wildlife Center of Roanoke, Inc. (the "SVWC"). *Seymour*, 301 Va. at 162. Although the petitioners' home was "not located on the easement itself," "all traffic to and from the SVWC Property" had to pass their home in order to reach the SVWC. *Id.* In support of their challenge to the BZA decision,

Likewise, in *Morgan*, Wegmans Food Markets, Inc. ("Wegmans") obtained a zoning exception from the BZA to operate a 24-hour warehouse on the land it owned across the street from residential homeowners. ___ Va. at ___. Those homeowners petitioned the court to reverse the BZA's decision, alleging that construction and operation of the warehouse would cause:

> 860 additional tractor-trailer trucks per day traveling through their neighborhood; flooding that will affect one of the homeowner's properties and areas where their children play; chronic, excessive noise from truck back-up alarms; and the localized effect of night-sky light pollution from the taller lighting poles to be used in the facility's parking areas.

*Id.* at ___. Although the homeowners had not yet suffered any of the alleged harms at the time of their petition—unlike the petitioners in *Anders* and *Seymour*—the detailed factual allegations they presented nevertheless established with "sufficient definiteness" that those future harms were substantially likely to occur as a direct result of the BZA's decision. In support of those claims, the homeowners even alleged that a sound study conducted by the county showed that "'7 of the 8 decibel results . . . violated the maximum decibel levels allowed on adjacent properties' under the County Noise Ordinance." *Id.* at ___ (alteration in original).

Appellant, on the other hand, makes no similar sufficiently definite allegations—such as the estimated growth patterns and maturity timeline for the canopy trees—to support his allegation that the Lauros' tree limbs are substantially likely to encroach onto his property.[22]

_____

the petitioners asserted that members of the public already frequently stopped at their house "to ask for directions to the SVWC." *Id.*

[22] The dissent suggests that the Lauros' own site plan (Figure 1 in the dissent) renders appellant's claims sufficiently definite because "we can assume that it reflects the Lauros' plans for the mature trees" and "accounts for how the Lauros might trim or redirect the trees." The majority finds that to be a speculative, unfounded assumption. At best, the site plan depicts the estimated radius of the mature trees' canopies if the trees grow straight up with neither natural nor manmade interference. Those expectations, however, cannot predict how the trees will grow in reality, how long it will take for the trees to reach maturity, or what steps the Lauros may take

Without explaining how or when, appellant merely contends that encroachment will inevitably occur and require him to expend time and money on self-help measures to remove the encroaching limbs from his property. While this Court accepts that such encroachment could burden appellant in the ways he alleges, it cannot conclude that the existence of such problematic encroachment is reasonably certain to occur, let alone as a direct result of the BZA's decision. Just because a harm has the remote potential to occur does not make such occurrence reasonably likely. *See Anders*, 301 Va. at 122 n.3 (holding that the petitioners' allegations about the safety risks posed by the teenage girls expected to attend Newport Academy once it becomes fully operational "are on this record entirely implausible and speculative").

Here, appellant's claim of harmful vegetative encroachment presupposes the occurrence of a series of other necessary intervening events, all of which are speculative and break any causal connection to the BZA decision. Assuming the Lauros plant the proposed trees in accordance with their current site plan diagram, appellant's personal and property rights will not be affected immediately, if ever. Any measure of encroachment from the tree limbs inherently relies on the existence of the trees themselves, the particular direction of the trees' growth, the height and width the trees reach after an unknown period of time, and any failure of the Lauros to adequately maintain the matured trees within the confines of their property. Therefore, the mere planting of the trees does not equate to inevitable encroachment.[23]

---

when maintaining the trees, such as trimming or redirecting canopy growth to prevent encroachment onto appellant's property. It would be absurd to suggest that the BZA's approval requires the Lauros to take steps to ensure the trees *grow* in a manner that perfectly reflects the estimated site plan. Rather, the only reasonable inference to be drawn from the site plan itself is that the Lauros will *plant* the trees in the depicted locations. Therefore, in comparison to the detailed claims made in *Morgan*, appellant's assertions here read as merely generalized assumptions based on a series of speculative events which do not give rise to a reasonable inference that his alleged harm is substantially likely to occur.

[23] Because the tree saplings do not infringe upon appellant's right to the free and exclusive use of his property, and any future encroachment is not guaranteed to occur, lack of

In contrast, the harms of noise, air, and light pollution alleged by the homeowners in *Morgan* were virtually certain to occur as a result of the increased transport of goods from the BZA-authorized 24-hour warehouse, which necessitated hundreds of additional trucks traversing that area every day at all hours. *See Morgan*, ___ Va. at ___. There, the Court found that the specific and supported allegations of harm were not "mere hypothetical or conjectural situations that might possibly occur in the distant future." *Id.* at ___. Accordingly, *Morgan* does not stand for the proposition that a party's bare assertions of a particular harm, even if wildly speculative, give rise to standing under Code § 15.2-2314.

Furthermore, the relationship (or lack thereof) between the alleged harm and the challenged BZA decision sets appellant's case distinctly apart from the Supreme Court cases upon which he relies. *See id.* at ___ (recognizing that "a causality factor has always been embedded in the standing requirement"). In *Seymour*, *Anders*, and *Morgan*, the harms alleged by the petitioners were directly tied to the defendant-landowners' property development activities, which could not occur but-for authorization from the BZA.[24] The petitioners in *Seymour*

_____

standing to challenge the BZA decision will have no effect on appellant's ability to assert his property rights in the future if an actionable encroachment does occur. *See Fancher v. Fagella*, 274 Va. 549, 556 (2007) (holding that vegetative overgrowth onto a neighboring property may be actionable as trespass or nuisance only when it "cause[s] actual harm or pose[s] an imminent danger of actual harm to the adjoining property"). *Compare id.* ("[T]he adjoining landowner *may*, at his own expense, cut away the encroaching vegetation to the property line whether or not the encroaching vegetation constitutes a nuisance or is otherwise causing harm or possible harm to the adjoining property." (emphasis added)), *with Seymour*, 301 Va. at 169 (finding particularized harm existed where petitioners were *required* to pay additional costs to maintain the shared private easement).

[24] The harms alleged in *Morgan* would not occur if Wegmans did not build the proposed 24-hour warehouse *and* Wegmans could not undertake such action without BZA approval of its rezoning and special exception requests. The dissent's assertion that Wegmans did not require such BZA approval misconstrues the parties' arguments and the Court's findings in *Morgan*. Wegmans characterized the petitioners' challenge to the warehouse development as "an untimely effort to challenge the Board's 1995 decision to rezone the property to authorize industrial uses." ___ Va. at ___. But the Court disagreed, not because Wegmans could have undertaken the proposed 2020 development without BZA approval in 1995, as the dissent mistakenly suggests,

plausibly argued that the BZA-authorized expansion of a wildlife center, designed to provide greater services to the public, would result in increased traffic past their residential homes, thereby causing the alleged harms of pollution, congestion, and noise. Similarly, the substantial increase in traffic necessitated by the creation and ongoing operation of the BZA-authorized treatment facility and 24-hour warehouse in *Anders* and *Morgan*, respectively, was the direct cause of the petitioners' alleged harms.

Because those harms arose from developments that would have otherwise been prohibited in the absence of BZA authorization, Code § 15.2-2314 provided the petitioners an opportunity to prevent the harm from occurring. A successful challenge to the BZA decision in each of those cases would foreclose the land use from which the alleged harms would arise. On the other hand, the specific land use authorized by the BZA here is for the expansion of the Lauros' residence into the 50-foot RPA setbacks. The construction and use of that expanded residence will not cause appellant's alleged harm of vegetative encroachment. Nor does appellant claim that the Lauros' exception to develop a larger footprint of impermeable area on

---

but rather because the 1995 decision related only to the general rezoning of the area. *Id.* at ___. It was not until 2020 that Wegmans submitted detailed development plans for the 24-hour warehouse, thus giving the homeowners cause to challenge the BZA's authorization of the specific land uses that would give rise to the alleged harms. *Id.* at ___ ("No such development plan had been on the table earlier. It is difficult to imagine that standing to challenge this specific use would have existed 25 years before it was even arguably a reality. To be sure, our reasoning in *Friends of the Rappahannock* makes this very point by emphasizing that only a specific set of particularized harms, not a broad-spectrum list of hypothesized harms, satisfies the standing requirement." (footnote omitted)).

      The Court ultimately concluded that "[t]he homeowners do not generalize about industrial sites in the abstract or speculate about potential harms associated with a permitted use within the general zoning classification of the property." *Id.* at ___. Rather, the homeowners asserted specific, particularized harms "arising out of the Board's 2020 approval of Wegmans's development plan." *Id.* at ___. One can draw an analogy to appellant's case by considering the difference between the Lauros' right to expand the horizontal footprint of their house and their right to add additional vertical stories. Whereas the former requires BZA approval because it constitutes a further encroachment into the RPA setbacks, the latter is not restricted by the Bay Ordinance and CBPA because the expansion exists only in the Lauros' airspace.

- 19 -

their property would infringe his own property rights or degrade the waters of the Chesapeake Bay in violation of the Bay Ordinance and CBPA.[25]

As a result, his challenge is not to the BZA decision itself, but rather to the Lauros' related proposal of planting trees to help mitigate the environmental impact of their expanded residence. That the Lauros chose to include such action as part of their mitigation plan—with which they must comply if they expand their house in accordance with the BZA exception—does not negate their free-standing right to plant trees on their property without consulting the BZA. And although it found the mitigation plan sufficient to warrant granting the exception to the Bay Ordinance, the BZA did not grant any new property rights or remove any existing rights by authorizing the Lauros to expand their residence into the RPA setbacks.[26]

Indeed, appellant does not suggest that the Lauros *could* not plant canopy trees along the border of his property without BZA approval; rather, he merely claims that they *would* not plant those trees if the exception to expand their house were revoked.[27] While likely correct, that

---

[25] In contrast, some of the claims made by the petitioners in *Morgan* specifically alleged that Wegmans's proposed developments would "encroach into resource protection areas in violation of the Chesapeake Bay Preservation Act and the county ordinance implementing the Act," and "'would violate the County's Noise Ordinance during [its] construction and continuous operation' based upon a 'sound study' conducted by County staff." ___ Va. at ___ (alteration in original). Appellant makes no similar allegations of harm arising from the Lauros' home renovation itself.

[26] As noted above, the dissent agrees with appellant that the BZA decision requires the Lauros to plant trees in accordance with their mitigation plan. However, this Court notes a fine distinction between authorizing an action otherwise prohibited—such as the developments at issue in *Anders* and *Morgan*—and granting an exception to a zoning ordinance based on a finding that the proposed mitigation measures are sufficient to prevent other harms unrelated to appellant's claims.

[27] The court's authority to address prospective harm in the context of a challenge to a BZA decision is very different from the court's general ability to provide redress for a violation of a party's rights that has already occurred. The former power is limited and meaningful only if the harm will not occur in the absence of the challenged BZA decision. Relevant to that calculus here is whether reversing the BZA's decision would remove the threat of future vegetative encroachment. The answer here is a resounding no because such reversal would not affect the

assertion does not support a claim of standing where, as here, reversal of the BZA decision will not impair the landowner's right to engage in the activity from which appellant's alleged harm arises.

Even if the circuit court had reversed the BZA decision on the basis of appellant's substantive arguments, that favorable ruling would neither restrict the Lauros' right to plant trees on their property nor serve to prevent any future harm from encroachment by those trees. Because such an outcome evidences a lack of justiciable controversy, adopting appellant's stance would thwart the purpose of the standing requirement in Code § 15.2-2314. *See Morgan*, ___ Va. at ___ ("Whether the homeowners can actually prove these allegations, however, is not the question before us. It is sufficient . . . that they describe with specificity an "'actual controversy' involving an actual 'antagonistic assertion and denial of right.'" (quoting *Ames Ctr., L.C. v. SOHO Arlington, LLC*, 301 Va. 246, 253 (2022))).[28]

_____

Lauros' right to plant any number and kinds of trees on any part of their property. And quite frankly, it is not hard to imagine the Lauros implementing all aspects of their current mitigation plan, including the 13 canopy trees, before resubmitting their request to the BZA for an exception to expand their residence. In fact, they could have lawfully planted those 13 canopy trees in the exact locations depicted in their site plan diagram during the pendency of this appeal and appellant would have no legal avenue by which to challenge that exercise of their property rights.

[28] This conclusion is not a comment on the merits of appellant's underlying claims. "[B]efore a complaint for declaratory judgment can be entertained by the circuit court," the complainant must allege facts "demonstrat[ing] an actual controversy between the plaintiff and the defendant such that [the plaintiff's] rights will be affected by the outcome of the case." *Charlottesville Area Fitness*, 285 Va. at 98 (alterations in original) (quoting *W.S. Carnes*, 252 Va. at 383). Such controversy between the parties must be "based upon present rather than future or speculative facts." *Id.* (quoting *Shanklin*, 205 Va. at 229). This "actual-controversy requirement protects a court from issuing an 'advisory opinion' — which is an essential concern of both the standing doctrine, and the Declaratory Judgment Act." *Morgan*, ___ Va. at ___ (internal citations omitted).

Only if, and when, the trees cross onto appellant's property (or present an impending threat of encroachment) may appellant's property rights be affected and asserted.[29] Accordingly, the existence of the trees is a necessary but not sufficient step toward the harm appellant alleges. The sheer number of variables affecting whether the matured trees may ever constitute or threaten an encroachment merely emphasize the fact that neither appellant nor this Court can determine the source of appellant's alleged future harm at this point in time without resorting to pure guesswork and speculation.[30] But this Court can conclude that any initial tree-planting will not harm appellant, regardless of whether the trees are planted pursuant to the current mitigation plan. Thus, the harm of vegetative encroachment is not "fairly traceable" to the BZA decision itself and reversal of such decision will not prevent the possibility of future vegetative encroachment.[31]

---

[29] Appellant has not provided any basis for this Court to find that the BZA's decision will result in a loss of his ability to enforce his personal or property rights against the Lauros should any actionable harm from future vegetative encroachment ever occur. *See, e.g. Fancher*, 274 Va. at 556 ("[T]he owner of the tree or plant may be held responsible for harm caused to [adjoining property], and may also be required to cut back the encroaching branches or roots, assuming the encroaching vegetation constitutes a nuisance." (second alteration in original)).

[30] Consider the following example: if half of the trees grow sideways across appellant's property but the other half grow in the opposite direction onto the Lauros' property, in the absence of any human intervention, would it be reasonable to say that the BZA decision caused the encroachment for only half the trees? This Court finds such a conclusion of causality untenable where the trees' positions at their maturity is solely attributable to the unpredictability of mother nature. Based on different weather patterns, areas of shade, nutrients in the soil, and myriad other speculative factors, it is equally possible, and unknowable, that all the trees could grow permanently angled away from appellant's property and never encroach onto his land.
Furthermore, irrespective of the natural growth of the trees, the Lauros could prevent the possibility of encroachment by regularly trimming and maintaining the trees' distance from appellant's property. Take it one step further and the Lauros could even attempt to manipulate the natural growth patterns of the trees to bend them away from appellant's property.

[31] Although the causality requirement discussed in *Morgan* "does not mean that 'the defendant's actions are the very last step in the chain of causation,'" it does require those actions be a necessary part of the chain such that the alleged harm would not occur but for the challenged decision. ___ Va. at ___ (quoting *Mattaponi Indian Tribe*, 261 Va. at 376).

- 22 -

In sum, because the unknown natural growth of the trees and the Lauros' independent maintenance choices control whether appellant's property rights will ever be threatened by vegetative encroachment, this Court cannot conclude that the alleged harm is substantially likely to occur at all, let alone *as a result of* the BZA's decision. Therefore, having failed to satisfy the standard for establishing a particularized harm under the continuum laid out in *Morgan*, appellant lacks standing as an "aggrieved person" to challenge the BZA's decision pursuant to Code § 15.2-2314. To hold otherwise would require circuit courts to entertain cases in which a party's challenge to a BZA decision is based on uncertain possibilities rather than reasonable probabilities. "In zoning cases, no less than all others, allegations of standing 'must be something more than an ingenious academic exercise in the conceivable.'" *Morgan*, ___ Va. at ___ (quoting *Warth v. Seldin*, 422 U.S. 490, 509 (1975)).

CONCLUSION

Pursuant to Code § 15.2-2314, standing to challenge a BZA decision rests exclusively with a person "aggrieved" by the decision, a requisite component of which is a showing of "particularized harm." Appellant contends he has standing to challenge the BZA's land use decision regarding his neighbors' property development on the basis that the trees depicted in the site plan will eventually encroach onto his property. Because the possibility of future injury resulting from such potential encroachment relies upon multiple layers of speculation, this Court finds that appellant has failed to sufficiently plead a "particularized harm" to his personal or property rights caused by the challenged BZA decision. Therefore, by finding that appellant does not qualify as "aggrieved," this Court affirms the judgment of the circuit court dismissing the case for lack of standing.

*Affirmed.*

Callins, J., dissenting.

Appellant Cumberland owns land directly adjacent to the Lauros' property. The Lauros wish to expand the footprint of their waterfront house and applied for a Chesapeake Bay Preservation Act ("CBPA") exception from the Middlesex Board of Zoning Appeals ("BZA"). To mitigate the home improvements, the BZA approved an exception application, including a site plan, requiring the Lauros to plant vegetation in specific locations around their property. The Lauros site plan clearly depicts the canopies from the plantings encroaching on Cumberland's property more than ten feet.



Figure 1: Portion of the site plan with Cumberland's property line in red

"[A]s 'a preliminary jurisdictional issue,' the standing doctrine asks only whether the claimant truly has 'a personal stake in the outcome of the controversy.'" *Morgan v. Bd. of Supervisors of Hanover Cnty.*, ___ Va. ___, ___ (Feb. 2, 2023) (quoting *McClary v. Jenkins*, 299

Va. 216, 221-22 (2020)).  To have standing, a petitioner must "allege facts demonstrating a particularized harm to some personal or property right, legal or equitable, or imposition of a burden or obligation upon the petitioner different from that suffered by the public generally."  *Id.* at ___ (quoting *Anders Larsen Tr. v. Bd. of Supervisors*, 301 Va. 116, 121 (2022)).  "For standing purposes, '[a]n allegation of future injury may suffice if the threatened injury is "certainly impending," or there is a '"substantial risk' that the harm will occur.""  *Id.* at ___ (alteration in original) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). In his petition to the circuit court, Cumberland asserted that "by approving the Lauros' proposed site plan and granting a special exception, the BZA improperly authorized an encroachments of tree limbs from the Subject Property over the Cumberland Property - causing the Cumberlands a particularized harm to their property rights."

## BACKGROUND

Under the CBPA, waterfront landowners must ensure that their home improvements in protected areas do not degrade the local water quality.  *See* Zoning Ordinance 71 at § 4A-15(C)(5).  In order to receive an exception from the CBPA's setback requirements, the Lauros submitted site drawings that, according to the application requirements, showed the "[t]ype and location of proposed best management practices to mitigate the proposed encroachment" and the "[t]ype and location of replacement vegetation."  *See also* Zoning Ordinance 71 at § 4A-12(C); Zoning Ordinance 71 at § 4A-15(C).  The BZA may only approve CBPA exceptions if "[r]easonable and appropriate conditions are imposed which will prevent the exception request from causing a degradation of water quality."  Zoning Ordinance 71 at § 4A-15(C)(5).

The Lauros' CBPA exception application proposed using tree cover as an "erosion and sediment control practice."  To mitigate the impact of their home improvements, the Lauros plan

to plant 39 new trees in specific locations along their property line, as shown above in Figure 1. The 39 new trees include 13 canopy trees: 4 white oak trees, 2 red maple trees, 3 multi-stem birch trees, and 4 sour gum trees. The Lauros' site plan anticipates that the canopies from those trees will extend onto Cumberland's property more than ten feet.

As required by Zoning Ordinance 71 at § 4A-15(G), the conditions of the CBPA exception application warn that any approval of a CBPA exception is issued on the "basis of plans and applications approved by the Zoning Administrator and authorizes *only the use, arrangement and construction set forth in such approved plans and applications*." (Emphasis added). Any deviations from the plans and applications submitted will render an approved CBPA exception null and void. The BZA approved the Lauros' site plans exactly as submitted.

## ANALYSIS

### I. Cumberland's alleged harm is not speculative.

When reviewing a motion to dismiss, "we treat the factual allegations in the petition as we do on review of a demurrer." *Bragg v. Bd of Supervisors of Rappahannock Cnty.*, 295 Va. 416, 423 (2018) (quoting *Va. Marine Res. Comm'n v. Clark*, 281 Va. 679, 686 (2011)). "[A] demurrer tests the legal sufficiency of facts alleged in pleadings, not the strength of proof." *Mark Five Constr. Inc. v. Castle Contractors*, 274 Va. 283, 287 (2007) (quoting *Glazebrook v. Bd. of Supervisors*, 266 Va. 550, 554 (2003)). We "assume without any corroboration that factual allegations made with 'sufficient definiteness' are presumptively true." *Morgan*, ___ Va. at ___ (quoting *Squire v. Va. Hous. Dev. Auth.*, 287 Va. 507, 514 (2014)). A demurrer will be overruled if the pleading it challenges contains "sufficient definiteness to enable the court to find the existence of a legal basis for its judgment." *Mark Five Constr.*, 274 Va. at 287-88 (quoting *Hubbard v. Dresser, Inc.*, 271 Va. 117, 122 (2006)). We also "interpret those allegations in the light most favorable to the plaintiff," *Nationwide Mut. Fire Ins. Co. v. Erie Ins. Exchange*, 297

Va. 455, 457 (2019) (quoting *Sweely Holdings, LLC v. SunTrust Bank*, 206 Va. 367, 371 (2018)), and "credit 'unstated inferences' to the extent that they are not 'strained, forced, or contrary to reason,'" *Morgan*, ___ Va. at ___ (quoting *Doe ex rel. Doe v. Baker*, 299 Va. 628, 641 (2021)).

In his petition to the circuit court, Cumberland asserted the factual allegation that "by approving the Lauros' proposed site plan and granting a special exception, the BZA . . . authorized an encroachment of tree limbs from the Subject Property over the Cumberland Property . . . ." A review of the site plan clearly shows the existence and extent of the anticipated encroachment, thus I would take this allegation as sufficiently definite and presumptively true.

The majority challenges that statement as insufficiently definite and declines to credit Cumberland's unstated inference that the Lauros will proceed with the site plan. I disagree that Cumberland's inference that the site plan is reliable is "strained, forced, or contrary to reason." *See Morgan*, ___ Va. at ___ (quoting *Baker*, 299 Va. at 641).[32] To the contrary, it was more than reasonable for Cumberland to infer that the Lauros' site plan accurately reflects the Lauros' intentions for their property. The Lauros were required to submit a vegetation site plan to apply for a CBPA exception, and the exception was necessary to move forward with their plans to improve their home. This application, including the site plan, had to be approved by the BZA. *See* Zoning Ordinance 71 at § 4A-15(A). It appears that the BZA is the only body with the authority to approve amendments after the initial approval. *See* Zoning Ordinance 71 at § 4A-15(A); Code § 15.2-2309(6). On appeal, we should hold the Lauros to the representations

---

[32] The appellees argue that the site plan does not mandate the location and types of trees because that is a "detail[] that remain[s] subject to oversight by zoning staff." They also assert that "Middlesex County's site plan process still requires Zoning approval before construction may begin. During the Zoning approval phase, the location of these plantings would be discussed and may be moved." They made similar arguments at trial. However, those arguments are without merit, as only the BZA may approve variances of this kind. *See* Code § 15.2-2286; Zoning Ordinance 71 § 4A-15(A).

that they made to the BZA. At this stage in the proceeding, we must accept the factual allegations in the petition, not the allegations in the motion to dismiss. *Morgan*, ___ Va. at ___.

The majority relies on three main points to conclude that Cumberland's claim of harm is speculative, none of which are persuasive. The first point is that the Lauros may never plant the trees that are required by the BZA. It is true that, even after a landowner expends considerable resources procuring a permit, they may not end up using it. If the Lauros decide not to proceed with the home improvements, they will not need the exception. A similar hypothetical could have been presented in *Morgan*, *Anders*, and *Seymour*. However, the possibility that a landowner will not use their permit does not mean that every claim tied to that permit is speculative. If that were the case, then no individual would ever have standing to challenge a permit under Code § 15.2-2314 and every claim would be inherently speculative. The Lauros expended their resources procuring this permit, and they procured the permit based on the approved site plan. Cumberland is entitled to expect that the Lauros will act on the permit. The expectation is a reasonable conclusion based on the facts presented. The inference that the Lauros will proceed under the site plans that they submitted to the BZA is simply not "strained, forced, or contrary to reason." *Morgan*, ___ Va. at ___ (quoting *Baker*, 299 Va. at 641).

Second, the majority finds that this site plan does not demonstrate a substantial risk that the trees will encroach upon Cumberland's land because it does not account for how the trees will naturally grow once planted, how long it will take for them to reach maturity, or how the Lauros may trim or redirect canopy growth to prevent encroachment onto appellant's property. This contention is contrary to the evidence. The site plan *does* account for how the trees will naturally grow because it assumes that the trees will grow upward, toward the sun, and the tree branches will grow around the trunk to form a canopy. Indeed, the success of the mitigation depends upon this assumption. And, as a site plan submitted by the Lauros, we can assume that

it reflects the Lauros' plans for the mature trees. That is, the site plan accounts for how the Lauros might trim or redirect the trees by demonstrating that the Lauros did *not* plan on doing those things.

Last, the majority asserts that an encroachment will only occur if the Lauros fail "to adequately maintain the matured trees within the confines of their property." But neither the approved site plan nor the permit require the Lauros to maintain the trees within the confines of their property. As the majority recognizes, landowners do not usually have a legal duty to maintain their trees within the confines of their property. *See Fancher v. Fagella*, 274 Va. 549, 556-57 (2007). There is no reason to believe that the Lauros will prune the trees away from the property line. In fact, the approved CBPA exception requires that the Lauros must not prune the trees' "central leader or branch tips," and it is not clear from the record that the Lauros could prune the trees away from the property line and remain in compliance with that requirement.

The majority also contends that Cumberland was required to specifically allege the "growth patterns and maturity timelines" for the trees, even though the record shows the anticipated growth patterns for the trees. The Lauros' site plan estimates that the trees will grow upwards and that the mature trees will encroach more than ten feet onto Cumberland's land. Because that evidence was readily available in the BZA record, I would not find that Cumberland was required to restate as much in his petition in order to render his allegation "sufficiently definite."

I also disagree with the majority's hyper-emphasis on the immediacy of the alleged harm. In sculpting this new temporal element, the majority provides no limiting principle that would help a trial court understand when a harm is too distant in time to permit standing or when a harm is too remote in time to permit standing. Instead, I would hold that "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, *or* there is a substantial

risk that the harm will occur." *Morgan*, ___ Va. at ___ (alteration in original) (emphasis added). This threshold is clear and unequivocal. The "immediacy" of the harm is not an independent requirement for standing. "[W]hile '[t]he standing question thus bears close affinity to questions of ripeness,' and gives no quarter to 'speculative allegations of harm,' these concepts are not strictly synonymous. Standing determines who may file a lawsuit — not who can win one." *Id.* at ___ (first quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975); and then quoting *Seymour v. Roanoke Cnty. Bd. of Supervisors*, 301 Va. 156, 168 (2022)). Despite that, the majority, without reason, finds that the immediacy of the alleged harm is a "crucial component" of the standing analysis.

It is not uncommon for a permit to be granted and construction to be delayed, but not every construction delay serves to defeat standing. In the same way, there will certainly be a delay between the time the Lauros plant the trees and the time that the trees encroach upon Cumberland's property. That does not change the fact that there is a "substantial likelihood" that the trees will encroach, just as a construction delay does not necessarily change the likelihood that the construction will occur.

In sum, it is a court's role to accept the sufficiently definite factual allegations in the complaint, as well as all reasonable inferences flowing from them. Thus, I accept Cumberland's allegation that the BZA approved a future, inevitable, encroachment onto his property. Because that encroachment will impose a burden on Cumberland in a way that is "different from that suffered by the public generally," I would find that Cumberland has demonstrated a particularized harm.[33] *See Morgan*, ___ Va. at ___ (quoting *Anders Larsen Tr.*, 301 Va. at 121).

___

[33] Whether someone is an aggrieved party is a question of law that we must review de novo. *Anders Larsen Tr.*, 301 Va. at 122 ("We review de novo the question of whether the appellants' factual allegations were sufficient to establish standing, as this issue presents a question of law." (quoting *Platt v. Griffith*, 299 Va. 690, 692 (2021))). Contrary to the majority's contention, I am not simply inferring that Cumberland is an aggrieved party. Instead,

*II. Cumberland's alleged harm is fairly traceable to the BZA's decision.*

The majority also contends that there is not a causal connection between the tree plantings and the BZA's decision. I disagree.

To have standing, a plaintiff must establish "a causal connection between the injury and the conduct complained of, that is, the injury must be fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party not before the court." *Mattaponi Indian Tribe v. Va. Dep't of Env't Quality ex rel. State Water Control Bd.*, 261 Va.

---

I use the fact of the encroachments to reach the conclusion that Cumberland is aggrieved by the BZA's decision to approve the site plans. *See Va. Beach Beautification Comm'n v. Bd. of Zoning Appeals*, 231 Va. 415, 419 (1986) ("In order for a petitioner to be 'aggrieved,' it must affirmatively appear that such person had some direct interest in the subject matter of the proceeding that he seeks to attack."). As is appropriate, I only take the position that we should apply the usual demurrer standard of review to the facts of this case. *See Morgan*, ___ Va. at ___ ("When a court dismisses a complaint on demurrer, we assume without any corroboration that factual allegations made with 'sufficient definiteness' are presumptively true.").

The majority contends that none of Cumberland's rights are affected by either this encroachment, or by the majority's finding that he does not have standing. But "[n]early every form of judicial relief (damages, specific performance, injunctive remedies, extraordinary writs, etc.) requires proof of a specific legal right that was infringed and that is capable of being remedied by a court." *Id.* at ___. "If the standing analysis simply tracked this decisional sequence on the merits, it could create an absurdity: A court would never be able to decide the merits of a claim against a claimant because that would mean the court never had jurisdiction to address the merits in the first place." *Id.* at ___. The majority suggests that Cumberland's rights have not been violated before he has even had a chance to assert his rights. In doing so, it creates the absurdity that the Supreme Court cautioned in *Morgan*, requiring Cumberland to prove a specific legal right was violated *before* he may go to trial on the merits of his case.

For the same reason, analogizing this case to a declaratory judgment action also misses the mark. Although the effect of a Code § 15.2-2314 challenge to a BZA decision may be similar, the applicable standard is not. The purpose of a declaratory judgment proceeding is the adjudication of rights before a right is violated. In a declaratory judgment action, the first question for the court is whether the parties have an "ongoing justiciable right or interest that could be aggrieved"—an *actual controversy*. *See Deerfield v. City of Hampton*, 283 Va. 759, 767 (2012). Conversely, the purpose of a challenge to a decision under Code § 15.2-2314 is to test the judgment of a local governing body. The controversy is inherent in the challenge. Thus, the relevant question for Code § 15.2-2314 challenges is whether the party challenging the decision has a *direct interest* in the outcome. *Va. Beach Beautification Comm'n*, 231 Va. at 419. While the Supreme Court has enveloped aggrievement into justiciability in the context of a declaratory judgment action, it has not done the opposite and read declaratory judgment's justiciability requirement into the aggrievement standard.

- 31 -

366, 376 (2001). "More flexible than traditional proximate-causation principles, the 'fairly

traceable' concept 'does not mean that "the defendant's actions are the very last step in the chain

of causation."'" *Morgan*, ___ Va. at ___ (quoting *Mattaponi Indian Tribe*, 261 Va. at 376). "If

it did, then the standing analysis would be no different from a merits analysis that turned upon

causation principles." *Id.* at ___.

The majority asserts that "[t]he harms alleged in *Morgan* would not occur if Wegmans

did not build the proposed 24-hour warehouse."[34] But I take *Morgan* to stand for something

different. In *Morgan*, the appellees "point[ed] out that it could have developed the property in

2020 pursuant to the 1995 ordinance without ever asking the Board to [act]." *Morgan*, ___ Va.

at ___. The Supreme Court was not convinced, writing, "[w]hile true, we do not see what this

point proves." *Id.* at ___.

> Had there been no Board decision at all in 2020, there would have
> been no governmental decision for the homeowners to complain
> about. Wegmans asked for and received a favorable decision from
> the Board in 2020. The fairly-traceable analysis for standing
> applies to that decision.

*Id.* at ___. The Supreme Court did not dispute that the property could have been developed

without the challenged decision from the County. *Id.* at ___. Instead, the Supreme Court found

that fact was irrelevant to the "fairly traceable" analysis. *Id.* at ___. The relevant act was the

Board's decision: "Had there been no Board decision at all in 2020, there would have been no

governmental decision for the homeowners to complain about." *Id*. at ___. Similarly, the fact

that the Lauros could plant the trees without reference to the BZA's decision does not impact the

"fairly traceable" analysis that we must apply here. Like in *Morgan*, the Lauros "asked for and

---

[34] The majority views the development, not the resulting harm, as the relevant benchmark for evaluating causality. This view assumes that the development itself is the same as the harm, which is not always true. For example, in *Morgan*, one of the harms was the harm that the development would cause to the water quality. ___ Va. at ___. That harm could have occurred due to any development, not just a Wegmans distribution center.

received a favorable decision" from the BZA. *See id.* at ___. "The fairly-traceable analysis for standing applies to that decision." *Id.* at ___.

As the majority recognizes, the Lauros could plant the trees without the challenged decision. But as part of that decision from the BZA, the Lauros are *required* to plant trees along the property line that they share with Cumberland. Thus, there is a clear causal connection between the BZA's exception approval that requires trees to be planted along the property line and the substantial likelihood that those same trees will be planted according to the site plan and encroach upon Cumberland's land. The injury will "not [be] the result of independent action of some third party not before the court." *See Mattaponi Indian Tribe*, 261 Va. at 376. Instead, it will be the result of the mitigation measures required by the BZA, and therefore fairly traceable to the BZA's decision.

To reach its decision, the majority went beyond the proper standard of review and used its own judgment to determine whether Cumberland's harms are sufficiently worthy of court review. But standing is unrelated to the merits of a claim. *Morgan*, ___ Va. at ___. Cumberland has sufficiently alleged that the Lauros' trees are substantially likely to encroach on his property and that the trees will be a burden that he alone must bear. Thus, Cumberland has met his burden to show that he is an aggrieved party under Code § 15.2-2314. I would reverse the trial court's judgment and remand this case for further proceedings. Thus, I respectfully dissent.